**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Stephanie K. STEARNS,**
**Defendant-Appellant.**

**No. 75–3011.**

United States Court of Appeals,
Ninth Circuit.

March 2, 1977.

Rehearing Denied March 29, 1977.

---

Winston Mirikitani, argued, Honolulu, Hawaii, for defendant-appellant.

Harold M. Fong, U. S. Atty., Wm. J. Eggers, Asst. U. S. Atty., argued, Honolulu, Hawaii, for plaintiff-appellee.

Before BROWNING, TRASK, and KENNEDY, Circuit Judges.

KENNEDY, Circuit Judge:

Stephanie Stearns was convicted, after a jury trial, on two counts of theft of personal property within the special maritime and territorial jurisdiction of the United States, violations of 18 U.S.C. § 661, and on one count of transporting stolen property in interstate and foreign commerce, a violation of 18 U.S.C. § 2314. On appeal she contends that the district court erred both in admitting certain photographs and in denying a motion to consolidate the three counts. We affirm.

The principal question on this appeal is whether the prosecution established a sufficient foundation for the admission at trial of an exhibit consisting of five photographs. To understand the significance of these photographs and the foundation problems they present, we must recount the voyages of two sailing vessels, the *Iola* and the *Sea Wind,* and describe their encounter at Palmyra, an uninhabited island in the Pacific about one thousand miles south of Hawaii.

The *Iola,* a 30-foot vessel, arrived in Palmyra harbor from Hawaii on June 25 or 26, 1974. The channel leading into the lagoon on Palmyra is narrow and difficult to navigate. The *Iola,* which had a broken motor, had to be towed through the channel by dinghies from two ships already anchored in the lagoon. The persons sailing on the *Iola* were the defendant Stephanie Stearns and one Buck Walker (alias Roy Allen), the *Iola*'s owner.

Apparently Stearns' and Walker's voyage from Hawaii had been an arduous one. It is doubtful whether the *Iola* was sufficiently seaworthy either for a return voyage to Hawaii or for a trip to Fanning Island, 175 miles further south and the nearest available place to obtain equipment and supplies. Stearns and Walker apparently intended to remain at Palmyra until friends arrived on another boat. The *Iola* had meagre supplies, and Stearns and Walker found it hard to adjust to a diet of coconut and fish. They tried to grow vegetables, with little success. One witness testified that Stearns told him she and Walker had ten dollars and some equipment, which she offered to exchange for food.

On July 1, the *Sea Wind* dropped anchor in the lagoon at Palmyra, where the *Iola* and other boats were located. The *Sea Wind,* a ketch 37½ feet long, equipped with auxiliary engines, stocked with abundant food and stores, and fitted with a complete tool shop, was owned and sailed by a Mr. Graham, who, with his wife, was on a cruise of the South Pacific. The Grahams had spent over two years planning the trip and provisioning the *Sea Wind.*

In late August 1974, all other vessels had departed from Palmyra, and only the *Iola* and the *Sea Wind* remained at the island. The Grahams had a prearranged pattern of radio contact with an operator in Hawaii. The operator's last radio conversation with Mr. Graham took place on August 28, 1974. All attempts to make further radio contact with the *Sea Wind* proved unsuccessful. The Grahams had mysteriously disappeared. They have never been found.

Three months later, the *Sea Wind* was recognized in a Honolulu yacht harbor. Stearns and Walker were now its crew. The ketch had been reregistered under another name and had been partially repainted. Stearns was charged with theft of the *Sea Wind,* theft of certain personal property of the Grahams aboard the *Sea Wind,* and transportation of stolen property in interstate commerce.

Stearns contended that the Grahams disappeared while the *Sea Wind* remained anchored in Palmyra harbor, and that after a search she and Walker had found the Grahams' dinghy overturned on a beach of the lagoon. She stated that she and Walker sailed the *Sea Wind* to Hawaii in order to protect it from vandalism, and that she intended to contact a relative of the Grahams to deliver possession of the ship. Stearns claimed that she and Walker attempted to tow the *Iola* behind the *Sea Wind,* but that the *Iola* stranded on a reef and sank as it left the narrow channel leading from the lagoon to the ocean.

The prosecution offered a different explanation. According to the Government, Stearns and Walker intended to steal the *Sea Wind.* To facilitate their crime they deliberately sank the *Iola,* a leaky boat they no longer needed, in the depths of the ocean away from the island. In support of its theory, the Government produced the *Iola*'s hatch cover, which had been recovered from a camp site on Palmyra.

The Government further offered, as part of its case in chief, the five photographs in dispute here. Each photograph shows a blue and white sailboat, not in tow, but under full sail at open sea. In three photo-

graphs an unidentified landfall is some miles distant in the background. A fourth photograph is taken from a second vessel: part of the second ship's deck and rigging is in the foreground; attached to its gunwales is a red protective net; there is open sea between this vessel and the blue and white craft sailing some yards away.

Testimony during the prosecution's case established that the blue and white craft in the five photographs is the *Iola.* The prosecution also introduced evidence showing that the second vessel in the foreground of the fourth photograph is the *Sea Wind.* The rather distinctive red net visible in the foreground of this picture is the same net that was on the gunwales of the *Sea Wind* when it returned from Palmyra and dropped anchor in the Honolulu yacht harbor. The Government contended at trial that all five photographs were taken from the *Sea Wind* while Stearns and Walker were returning to Hawaii. If the jury excepted the Government's version, the pictures of the *Iola* under full sail on the open sea, not far from the *Sea Wind,* severely damaged, if not destroyed, Stearns' claim that the *Iola* became stranded while under tow and sank just outside the channel entrance.

A stipulation by the parties as to chain of custody and other evidence introduced at trial established that Stearns left the film for developing at a drug store in Honolulu. The prints, until they were relinquished to the authorities, were in the continuous custody of Stearns' friends. Before Stearns' arrest, one friend picked the prints up at the drug store; after the arrest, another friend brought the photographs to the jail where Stearns was being detained. There the photographs were taken by a jailer and held for evidence.

The defense objected to introduction of the photographs, contending that the foundation was insufficient to establish the time and place the photographs were made. That argument is renewed on appeal.

 A photograph may be distorted, and thus inadmissible as a technically inaccurate representation of the scene photographed. A picture may also be inadmissible, although technically accurate, because it portrays a scene that is materially different from a scene that is relevant to one of the issues at trial. Before admitting a photograph into evidence, the trial court must find that the dangers of such distortion or wrong emphasis are sufficiently remote so that the trier of fact may consider the photographs for the purposes offered. These are principally questions of authentication. *See* Fed.R.Evid. 901 and notes of the Advisory Committee on Proposed Rules thereunder.[1] Resolution of these matters determines the purposes, if any, for which the jury may consider photographs. If the preliminary showing of authenticity is weak, it may become necessary to instruct the jury that it may consider the photograph only for limited purposes. *See* C. McCormick, Evidence § 59 (1954); Fed.R. Evid. 105. Authentication thus establishes the parameters of relevance.

 In this case there was little direct testimony concerning the technical accuracy of the photographs at issue. It was shown only that the prints were ordered and paid for at Stearns' direction, and that until they reached the hands of the authorities, they were in the possession of persons in privity with Stearns. There is no reason to believe, however, and Stearns does not claim, that the Government deliberately tampered with the photographs. Furthermore, "[t]here is a presumption of regularity in the handling of exhibits by public officials." *United States v. Coades,* 549 F.2d 1303, at 1306 (9th Cir., Feb. 3, 1977). The evidence was sufficient to establish as a threshold matter both that the photographic process had not been tampered with and that the photographs themselves were not distorted. Given the

---

1. The trial in this action took place in June 1975, before the effective date of the Federal Rules of Evidence. *See* Pub.L. 93–595 § 1, 88 Stat. 1926 (1975). The new rules and the notes of the Advisory Committee thereunder, however, provide useful guidance in analyzing the evidentiary problems in the instant case.

purposes for which these photographs were offered, precise technical details concerning camera settings, film type, and development process were not necessary as a foundation for their admission in evidence.

Proper authentication, however, did require that the Government identify the scene itself and its coordinates in time and place. Admissibility turned on these critical matters. If the photographs of the *Iola* were taken at a place or time other than on the open sea after the *Iola* had left the Palmyra channel in September 1974, they would not refute Stearns' defense. Indeed, they then would not be probative of any fact material to the case.

■ Part of the evidence bearing on authentication is circumstantial, derived from testimony about other matters. A critical part of the foundation, that relating to time, is derived only by referring to one of the photographs. In this respect the case is rather unusual, for that photograph by itself establishes a necessary element of its authenticity. No witness testified explicitly, during the Government's case in chief, where or when the pictures were taken or what they represented. Even if direct testimony as to foundation matters is absent, however, the contents of a photograph itself, together with such other circumstantial or indirect evidence as bears upon the issue, may serve to explain and authenticate a photograph sufficiently to justify its admission into evidence. Other courts have recognized that a photograph may have probative value that is independent of amplification by other testimony. *United States v. Taylor,* 530 F.2d 639 (5th Cir. 1976) *People v. Bowley,* 59 Cal.2d 855, 31 Cal.Rptr. 471, 382 P.2d 591 (1963). While these authorities have not considered whether a photograph can be used to make inferences bearing on its own foundation, we see no logical reason that restricts us from so holding in the case before us. *Cf.* Notes to Fed.R.Evid. 901 of Advisory Committee on Proposed Rules, Example (6).

■ There was ample evidence in the Government's case to show that the *Iola* remained in Palmyra harbor from the time it arrived at Palmyra until the time it left. It is therefore clear the *Iola* could have been photographed on the open sea only at two distinct times: either before the *Iola* reached Palmyra, or after its departure from the harbor during Stearns' and Walker's return voyage to Hawaii.

The crucial photograph is the one showing the blue and white *Iola* on the open seas, with the rigging of the *Sea Wind* in the foreground. Particularly significant is the red net shown on the *Sea Wind* in the photograph. The Government in its case in chief demonstrated that the *Iola* was equipped with the red net to prevent Stearns' and Walker's dogs from falling overboard when it was anchored at Palmyra. It could therefore be inferred that Stearns and Walker used the net for the same purpose on the *Iola*'s voyage from Hawaii. The Government established by testimony that the net on the *Sea Wind* in the foreground of the photograph was the same net that had been on the *Iola.* Since the evidence presented in the Government's case indicated that the *Iola* and the *Sea Wind* arrived at Palmyra four or five days apart and that their respective crews had no contact until the two vessels were moored in Palmyra harbor, it follows that the *Sea Wind* could not have been equipped with the *Iola*'s net until its return voyage to Hawaii. The picture showing the red net on the *Sea Wind* and its absence on the *Iola* thus establish that the photograph was taken on the return voyage.

The photograph with the *Sea Wind* in the foreground authenticates the other four pictures as to time. It is apparent that in all five photographs the cloud and sky conditions are the same, the lighting is the same, the distance between the camera and the *Iola* is substantially the same, and the color condition of the ocean is the same. The five prints, moreover, were obtained from the developer at the same time. It is reasonable to infer, therefore, that all five pictures of the *Iola* under its own sail were taken at the same time and place: from the *Sea Wind* on the return voyage to Hawaii and at open sea, away from the channel.

In light of the foregoing, there was sufficient authentication to admit the photographs to show precisely those occurrences. See Fed.R.Evid. 901(b)(3)–(4).

■ The crucial testimony identifying the Sea Wind's rigging and the red net in the photograph that provided the key to authenticating all photographs as to time and place, however, was not before the court when it admitted the exhibits. The court therefore committed error by admitting the evidence when it did. The court should have admitted the evidence conditionally, see E. Morgan, Basic Problems of Evidence 45–46 (3rd ed. 1961); Fed.R.Evid. 104(b) and notes of the Advisory Committee on Proposed Rules thereunder, or refused to admit the exhibits until sufficient evidence of authentication had been adduced. Nevertheless, all of the authenticating evidence to support admission of the photographs was introduced before close of the prosecution's case in chief. Moreover, the pictures, once admitted, were not used to elicit still further real or testimonial evidence pertaining to the defendant's guilt, and the jury did not examine the photographs until the end of the trial. These factors convince us that the premature admission of the evidence was harmless error. Fed.R.Crim.P. 52(a).[2]

■ Appellant further argues that the indictment was defective on grounds of multiplicity, and that the trial court therefore erred in denying her motion to consolidate the three counts charged. Count I of the indictment charged appellant with theft of the Sea Wind and count II with theft of $400 belonging to the Grahams that was aboard the Sea Wind, both in violation of 18 U.S.C. § 661. Count III charged her with transporting in interstate or foreign commerce property converted from the Sea Wind of a value in excess of $5,000, in violation of 18 U.S.C. § 2314.

Even though the theft of the Sea Wind (Count I) and the transportation of its contents with knowledge that they had been stolen (Count III) may arguably have been part of a single scheme, it is clear that "Congress has the power to establish that a single act constitutes more than one offense, at least as long as each offense requires proof of a fact the other does not." United States v. Jones, 487 F.2d 676, 679 (9th Cir. 1973). 18 U.S.C. § 661 and 18 U.S.C. § 2314 serve separate and distinct purposes. Section 661 makes it a federal crime to commit theft within the jurisdiction of the United States and outside the jurisdiction of any state. Section 2314 operates after a theft has been committed and is intended to aid the authorities in punishing persons who transport stolen property in interstate or foreign commerce in order to escape from the jurisdiction where the theft has been committed. See United States v. Marzano, 537 F.2d 257, 273 (7th Cir. 1976). Furthermore, a charge of theft under section 661 requires proof quite different from that necessary to convict on a charge of transporting stolen property. Section 661 requires proof of asportation of personal property with intent to steal, but does not require that the property be transported in interstate or foreign commerce. By contrast, section 2314 requires proof of transportation in interstate or foreign commerce, but not of taking with intent to steal. In light of the foregoing, we conclude that the district court did not err in refusing to consolidate counts I and III of the indictment and that the appellant could properly be convicted on both those counts.

Appellant was sentenced to imprisonment for two years on count I and to probation for five years on counts II and III. Since

2. Stearns testified in the defense case, and on cross-examination she made delphic statements indicating that the photographs had been taken with Buck Walker's camera and that the pictures were part of a roll of pictures taken on the way down to Palmyra and back. We do not rely on this testimony in deciding on the sufficiency of the authenticating evidence.

Since the photographs were admitted as part of the Government's case in chief, we may look only to the evidence produced in that phase of trial. To do otherwise might impose an undue burden on the defendant's privilege against self-incrimination. See United States v. Watkins, 171 U.S.App.D.C. 158, 519 F.2d 294 (1975).

appellant was properly convicted of count III, and since the probationary terms on counts II and III were imposed to run concurrently, under the concurrent sentence doctrine we need not consider her objections to count II. *United States v. Davis*, 548 F.2d 840, at 845 (9th Cir. 1977); *United States v. Ingman*, 541 F.2d 1329, 1331 (9th Cir. 1976); *United States v. Meeker*, 527 F.2d 12, 14 (9th Cir. 1975).

Appellant's last contention, that she was denied a fair trial because of prejudicial publicity, is without merit.

The judgment of conviction is affirmed.